IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD TAYLOR,<br><br>      PLAINTIFF,<br>v.<br><br>BALFOUR BEATTY INVESTMENTS, INC., BALFOUR BEATTY COMMUNITIES, LLC, and BALFOUR BEATTY MILITARY HOUSING MANAGEMENT LLC,<br><br>      DEFENDANTS. | Civil Action No.: _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND JURY DEMAND

Plaintiff Richard Taylor, by and through his undersigned attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Richard Taylor ("Mr. Taylor"), a former employee of Balfour Beatty Investments, Inc., Balfour Beatty Communities, LLC and Balfour Beatty Military Housing Management LLC (collectively, "BB"). Mr. Taylor has been harmed by Defendants' unlawful termination of his employment in violation of federal law. Specifically, despite being a stellar and valuable employee of BB for over two decades, after providing testimony to the United States government regarding major fraud committed by BB against the United States (which fraud did not involve Mr. Taylor in any way), and attempting to ensure ongoing compliance with BB's guilty plea to the government and commitment therein to continue to enhance its

compliance program and internal controls, Mr. Taylor was unceremoniously terminated on August 18, 2022, effective September 16, 2022.

2. This action arises under Title 18 of the United States Code, Section 1031(h).

## JURISDICTIONAL STATEMENT

3. This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. All conditions precedent to the institution of this suit have been fulfilled.

## VENUE

6. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b), because the claim arose in this judicial district, significant activities associated with the claims took place in this jurisdiction, and Plaintiff was employed and terminated by Defendants in this jurisdiction.

## PARTIES

7. Plaintiff Richard Taylor is an adult citizen and resident of James Creek, Pennsylvania and the United States of America.

8. Defendant Balfour Beatty Investments, Inc. is an investment company, Defendant Balfour Beatty Communities, LLC is a real estate services company, and Balfour Beatty Military Housing Management LLC is a management company, each with an address of 1 Country View Road, Malvern, Pennsylvania 19355, where Plaintiff was employed.

9. At all relevant times, Defendants acted by and through their authorized agents, servants and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

10. At all times relevant hereto, Plaintiff Richard Taylor was an "employee" of Defendants within the meaning of the laws at issue in this suit and is accordingly entitled to the protections of said laws.

11. At all relevant times Defendants each are and were an "employer" within the meaning of the laws at issue in this suit, and are accordingly subject to the provisions of said laws.

## FACTS

12. Plaintiff Richard Taylor is a decorated military veteran with 11 years of active-duty service to the United States Navy prior to joining BB in August of 2000.

13. Mr. Taylor's performance record while employed by BB was exemplary.

14. In fact, between 2002 and 2014, Mr. Taylor was the driving force behind the company holding the largest military housing portfolio within the Military Housing Privatization Initiative ("MHPI") program.

15. Owing in large part to Mr. Taylor's dedication and consistently excellent performance, the Balfour Beatty Group ("BBG") realized profits in connection with the MHPI that Mr. Taylor estimates to be in excess of $2,000,000,000.

16. In 2014, following his overwhelming success in the MHPI program, Mr. Taylor went on to lead a business effort to pursue Public-Private Partnerships ("P3 Projects") as President of Balfour Beatty Investments, North America ("BBI").

17. In this role, Mr. Taylor presented a business proposal that recommended expanding BBI's pursuit of P3 Projects into the Canadian market.

18. Just as he did with the MHPI, Mr. Taylor turned BBI's pursuit of P3 Projects into an extremely profitable venture for the company.

19. From 2014 through 2019, Mr. Taylor was responsible for three major P3 Project awards in Canada and one of the largest P3 Project awards in the United States.

20. Mr. Taylor left this position in 2019 and since that time, BBI has yet to successfully bid on another U.S. P3 Project.

21. At the same time that he was ensuring the pursuit of P3 Projects was a financial success for BB, Mr. Taylor also personally spearheaded BB's entry into the on-campus student accommodation market.

22. As a result of his success in this pursuit, Balfour Beatty Campus Solutions ("BBCS") was created and Mr. Taylor was named and served as its Chief Executive Officer ("CEO").

23. Under Mr. Taylor's leadership, BBCS was awarded significantly profitable projects.

24. In the Spring of 2019, the United States Senate Armed Services Committee ("SASC") conducted a hearing involving MHPI project owners, which included Balfour Beatty Communities LLC ("BBC").

25. In late 2019, the United States House Armed Services Committee ("HASC") announced that it would be conducting a follow-up hearing, which would also include BBC.

26. Mr. Taylor was tasked with giving testimony regarding alleged fraud that had been committed by BBC - fraud in which Mr. Taylor himself had no involvement.

27. Following the HASC hearing, Mr. Taylor was required to testify before Congress on three additional occasions with respect to BBC's fraud, with the most recent hearing having occurred in April 2022 before the United States Senate's Permanent Subcommittee on Investigations ("PSI").

28. The PSI's sole focus was on BBC and Mr. Taylor testified honestly, as he had in the three previous hearings, in accordance with his obligation to provide truthful testimony before Congress.

29. In testifying during these highly publicized hearings before Congress at BB's request, Mr. Taylor took on the role of the public face and mouthpiece of BBC and BB during an extremely difficult and trying time for the company.

30. Despite the fact that Mr. Taylor had not been a participant in any of the unlawful activity that was the subject of the hearings, Mr. Taylor engaged in lawful acts on behalf of his employer and at all times testified honestly and truthfully to Congress.

31. After Mr. Taylor provided testimony to Congress at the most recent hearing, in April 2022, Mr. Taylor informed Defendants that he no longer felt comfortable with providing testimony and would prefer to avoid future testimony.

32. In December 2021, BBC pled guilty to Major Fraud against the United States, in violation of Title 18, United States Code, Section 1031(a)(1) and also settled a civil False Claims Act suit filed against it by the United States relating to the facts underlying the criminal case.

33. As part of its guilty plea, BBC admitted that it had submitted false and fraudulent information to the United States Air Force, Navy and Army regarding maintenance requests at BBC's military housing communities.

34. As admitted by BBC, it made false representations to the three service branches that it was timely in addressing maintenance issues raised by military service members residing in BBC's military housing communities when in fact it was not and that it was completing repairs that had not, in fact, been completed.

35. BBC admits that it took these actions in order to qualify for Performance Incentive Fees where it knew that it was not entitled to such incentive fees.

36. As part of its scheme to enrich itself at the expense of the United States military service branches, BBC falsified and destroyed documents, including comment cards submitted by resident military service members.

37. BBC's fraud resulted in losses to the Department of Defense of $18,700,000 and BBC was sentenced with criminal fines in excess of $33,600,000 and over $31,800,000 in restitution.

38. BBC was also required, among other things, to serve three years of probation and to continue to implement a compliance and ethics programs to prevent and detect violations of U.S. anti-fraud laws in its operations.

39. Despite acting as BBC's spokesman during the Congressional hearings, and testifying honestly with respect to extremely difficult areas in front of Congress and the public at large, Mr. Taylor received no recognition by way of any communication from CEO Leo Quinn or Chairman of the Board of Directors Charles Allen.

40. Notably, Mr. Taylor met with Mr. Quinn and Mr. Allen in Florida less than a week following his testimony at his third Congressional hearing and had multiple calls and other interactions with Mr. Quinn following his fourth Congressional hearing, but received no recognition from either Mr. Quinn or Mr. Allen.

41. Instead, based on the lack of communication from top executives at BB, it appears that these higher-level executives were intent on presenting Mr. Taylor as BBC/BB and at the same time attempting to distance themselves from the public shame of BBC's admitted fraud against the military.

42. In fact, senior leadership discouraged Mr. Taylor from discussing the fraud and educating other employees with respect to remediation efforts.

43. For example, Mr. Quinn and Mr. Allen accompanied Mr. Taylor to a site visit at one of BBC's communities where Mr. Taylor provided information to the on-site team regarding the Congressional testimony and what might or should be done to avoid this type of fraudulent conduct in the future.

44. Mr. Taylor went into detail explaining how future violations could be prevented and afterwards, but prior to a follow-on site visit to another location that same day, Mr. Quinn pulled Mr. Taylor aside and urged him not to go into as much detail with the site teams during future presentations – discouraging Mr. Taylor from providing such information going forward.

45. Mr. Quinn's message to Mr. Taylor was in essence that he was discouraged from talking about the past violations and steps that might be taken to prevent future violations.

46. On August 12, 2022, Mr. Taylor met with Gavin Russell, CEO of Balfour Beatty Investments Limited.

47. During this meeting, Mr. Russell conveyed to Mr. Taylor that he had been pressured by BB executive leadership to make a senior leadership change and terminate Mr. Taylor's employment.

48. Mr. Russell went on to indicate that the proffered reason behind the decision to terminate Mr. Taylor was an alleged failure to timely notify his senior chain of command with respect to an incorrect gas water heater replacement at one of BB's military communities.

49. As a result of the incorrect replacement of the water heater, the U.S. Army issued a cure notice to BBC under the governing project agreement.

50. Mr. Taylor did notify his chain of command, prior to receipt of the cure notice.

51. The decision to terminate Mr. Taylor based on this alleged infraction is extremely suspect for a number of reasons.

52. First and foremost, while Mr. Taylor did not notify the CEO and CFO of the company of a routine failure in services immediately, he took swift action to resolve the issue when he was first notified of its occurrence, as would be expected of someone in his position.

53. Mr. Taylor validated proper correction of the issue, directed that the technician responsible for the improper installation be terminated the following day, confirmed that the affected resident recovered properly, and directed remedial measures to company policies regarding this type of work.

54. Additionally, another BBC executive had knowledge of the issue at the same time that Mr. Taylor did, but did not report the event up the chain of command.

55. This executive was not held to the same unreasonable standard that Mr. Taylor was.

56. And, as Mr. Russell acknowledged during the August 12th meeting, regardless of when Mr. Taylor's higher-ups were notified, the Army would have issued the cure notice nonetheless.

57. Taking such a dramatic action regarding a relatively minor alleged oversight by Mr. Taylor is also wildly inconsistent with BB's reaction to the actions of other senior executives.

58. For example, it is Mr. Taylor's understanding that all executives of BBC who led the company during the time that BBC was engaging in fraudulent activity against the government but failed to identify or report actions within their responsibilities, remained employed while Mr. Taylor, who did nothing wrong, was terminated.

59. Mr. Taylor's termination is also completely disproportionate to the conduct alleged based upon the way far more egregious conduct by other executives has been handled.

60. For example, Bob Shepko reported to Mr. Taylor and Human Resources that during a company function attended by Mr. Shepko and Nigel Lelew, Mr. Lelew threatened that if he "had a shotgun, [he] would come in and shoot [Mr. Shepko]."

61. Upon receiving this report from Mr. Shepko, Mr. Taylor promptly reported it to his former boss, Ian Rylatt.

62. Mr. Taylor urged that the threat by Mr. Lelew amounted to a terroristic threat, which could not be tolerated and that Mr. Lelew should be terminated.

63. Mr. Rylatt, on the other hand, indicated that Mr. Lelew had done a lot for the company and while he should perhaps be disciplined, he was not to be terminated.

64. Mr. Taylor also has concerns regarding BB's shifting reasons for his termination.

65. Since the August 12th meeting, and contrary to the information relayed to him by Mr. Russell regarding the supposed reason for Mr. Taylor's termination, BB has confirmed, in writing, that Mr. Taylor was being terminated without cause.

66. Based on the foregoing, the facts strongly suggest that Mr. Taylor's termination was motivated by retaliation for his honest testimony to Congress, in violation of 18 U.S.C. § 1031(h).

67. Mr. Taylor also has concerns about the impact of his age on his termination from BB.

68. At 56 years old, Mr. Taylor is particularly concerned about his ability to find suitable subsequent employment given the facts herein, his income level and level of seniority.

69. Mr. Taylor anticipates that finding a suitable position at a similar level, if he is able to find such a position at all, will take an exceedingly long period of time.

70. As part of its guilty plea, BBC is prohibited from publicly denying any of the above facts with respect to its defrauding the United States military.

71. As the face of BBC during the Congressional hearings, Mr. Taylor has grave concerns that he is now unemployable – the implication of his having been the individual to provide the testimony for BBC is obviously that he was somehow tied to the fraud when, in fact, he had no involvement whatsoever.

72. Indeed, a basic internet search of Mr. Taylor's name and Balfour Beatty – which he anticipates would be conducted as part of any routine background check by a prospective employer – immediately yields a significant number of articles, including Mr. Taylor's photo, that tie Mr. Taylor to BB's fraud despite his non-involvement.

73. Within days of BBC's guilty plea, Senator Elizabeth Warren posted an article about the guilty plea to her personal Facebook page, attaching Mr. Taylor's photo and further tying Mr. Taylor to BBC's actions.

74. Many members of the public who posted responses to the post made comments calling for Mr. Taylor to be fired over BBC's fraud.

75. Given his years of loyalty, dedication and consistently excellent performance at BB, and the circumstances surrounding his termination, Mr. Taylor maintains that BB unlawfully terminated him in violation of 18 U.S.C. § 1031(h).

76. Mr. Taylor has suffered significant emotional hardship and loss due to Defendants' wrongful acts, as alleged herein.

77. Mr. Taylor has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and/or inactions of Defendants.

78. Due to the Defendants' wrongful actions and/or inactions, Mr. Taylor has suffered significant financial damages and damages to his professional reputation.

79. Mr. Taylor has suffered financial losses and economic harm, which include, among other things, lost wages and an obligation for attorneys' fees and costs of bringing suit, as a direct and proximate result of the actions and inactions of Defendants.

<u>COUNT I</u><br>
<b>Violation of 18 U.S.C.A. § 1031(h)</b>

80. Plaintiff Richard Taylor repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

81. At all times relevant to this matter, Mr. Taylor was an employee of Defendants Balfour Beatty Investments, Inc., Balfour Beatty Communities, LLC and Balfour Beatty Military Housing Management LLC.

82. At all times relevant to this matter, Defendants Balfour Beatty Investments, Inc., Balfour Beatty Communities, LLC and Balfour Beatty Military Housing Management LLC were Mr. Taylor's employers.

83. By testifying truthfully and honestly to Congress, Mr. Taylor engaged in lawful acts in furtherance of a prosecution under 18 U.S.C. § 1031(h).

84. Mr. Taylor did not participate in the unlawful activity that is the subject of said prosecution.

85. The facts as set forth above indicate that Defendants terminated Mr. Taylor based upon his honest testimony to Congress, in violation of 18 U.S.C. § 1031(h).

86. Defendants' acts are in violation of 18 U.S.C. § 1031(h).

87. As a direct, foreseeable, natural, ordinary and proximate result of Defendants' wrongful conduct, Plaintiff Richard Taylor has suffered significant financial and other damages, interest due thereon, and has incurred attorney's fees and costs.

88. Based on the foregoing, pursuant to 18 U.S.C. § 1031(h), Mr. Taylor is entitled to reinstatement with the same seniority status Mr. Taylor would have had but for the discrimination and termination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination and termination, including litigation costs and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

89. Plaintiff Richard Taylor repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Richard Taylor respectfully requests that this Court enter judgment in his favor and against Defendants Balfour Beatty Investments, Inc., Balfour Beatty Communities, LLC and Balfour Beatty Military Housing Management LLC, and Order:

a. Appropriate equitable relief;

b.  Defendants to reinstate Plaintiff with the same seniority status he would have had if not for Defendants' unlawful acts;

c.  Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment lost due to the Defendants' unlawful conduct;

d.  Defendants to pay Plaintiff punitive damages;

e.  Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

f.  Defendants to pay two times the amount of back pay and interest on the back pay;

g.  Defendants to pay Plaintiff's costs of bringing this action, including, but not limited to, all litigation costs and Plaintiff's attorneys' fees;

h.  All equitable and other relief available pursuant to 18 U.S.C. § 1031(h);

i.  Any and all additional relief available to Plaintiff; and

j.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable.

*/s/ Jennifer C. Bell*
Jennifer C. Bell, Esquire
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA  19103

*Attorneys for Plaintiff Richard Taylor*

Dated: March 13, 2024